loss of rentals which the court was authorized to find arose from the operation of the road in the street; and we do not think that such damage can be said to have arisen exclusively from the standing of the cars, and the reception and delivery of mail matter therein.     On the contrary, we think it a fair inference to say that it arose from the ordinary operation of cars, as well as the particular things which were done, and which the judgment restrains.     This furnishes a sufficient basis for the support of the judgment.

So far as the appeal from the extra allowance of $500 is concerned, we think it must be sustained, as there is not in the evidence any basis upon which it can be allowed.     The Code of Civil Procedure (section 3253) provides for additional allowances to either party in difficult cases.     Subdivision 2 is as follows:

"In any action or special proceeding specified in this section, where a defense has been interposed, a sum not exceeding five per centum upon the sum recovered or claimed, or the value of the subject-matter involved."

Therefore, before there is any basis for such an allowance, proof must be given, or it must appear what the value of the subject-matter was.     As before observed, in this case there is no such proof.     Koehler v. Brady, 22 App. Div. 624, 47 N. Y. Supp. 984.     As the allowance formed a part of the judgment, and was entered therein, the point is available to the defendant upon this appeal.

It follows that the judgment should be modified by striking out the provision for the extra allowance, and, as modified, the judgment should be affirmed, without costs to either party.

---

(29 App. Div. 546.)

BELT et al. v. AMERICAN CENT. INS. CO.

(Supreme Court, Appellate Division, First Department. May 20, 1898.)

1. INSURANCE—AUTHORITY OF INSURED'S BROKERS.
    A stock of merchandise was insured with the understanding that, when certain changes were made in the building, the rate would be reduced.     A local board of underwriters, according to custom, sent the agents of insurer a printed slip stating that the changes had been made; and a few days later the insured's brokers, who had retained the policies for that purpose, surrendered them to said agents to have the reduction made, and received a "binding slip" from the insurer's agents describing the premises and amount of insurance and the policies surrendered, and declaring the insurance binding from that date.     The policies had indorsed on them, by the brokers of insured, a memorandum of the reduced rate and of a full co-insurance clause.     The original policy contained only an 80 per cent. co-insurance clause.     *Held*, that the brokers had implied authority to consent to such change.

2. SAME—RATIFICATION.
    Insurance policies had been held by the brokers of insured for the purpose of surrendering them, and having the rate reduced, as soon as contemplated changes were made on the premises.     They did so, and secured a "binding slip" from the insurer's agents, embodying a memorandum of the new insurance, and binding from date; and they consented that the policy be changed from an 80 to a 100 per cent. co-insurance clause.     The property was next day burned, and losses adjusted and paid on the basis of the policy as changed.     The insured signed a proof of loss referring to the policy in question as one with a 100 per cent. co-insurance clause, and there was evidence that it was called to his attention on

another list. Insured denied that the brokers had authority to consent to the change, or that he had knowledge thereof, and claimed it was made fraudulently after the loss had fixed the liability. *Held,* that by his acts he had ratified the change.

3. SAME—CONTRACT.

An agreement to insure property at a new rate, accompanied by a binding slip containing a memorandum of the terms "accepted" by the insurer's agents, constitutes a present contract of insurance on the new terms from the date thereof, and includes a change in a co-insurance clause which entered into the agreement.

4. SAME—AGENTS OF INSURER—POWERS.

A provision of an insurance policy that agents of the insurer have no authority to change its terms is for the benefit of the insurer solely, and will not avail the insured where the insurer has waived it, and adopted changes made by said agents.

Appeal from special term, New York county.

Action by Washington Belt and others against the American Central Insurance Company. There was a judgment for defendant, and plaintiffs appealed. Affirmed.

The following is the opinion of the court below (BEEKMAN, J.):

Upon the previous trial of this action the complaint was dismissed at the close of plaintiffs' case, on the ground that there had been a complete accord and satisfaction between the parties by the receipt by the plaintiffs of the amount paid them by the defendant on the settlement of the loss under the policy. The judgment which followed this decision was affirmed by the general term of this court, though on different grounds. 74 Hun, 448, 26 N. Y. Supp. 692. On appeal to the court of appeals (148 N. Y. 624, 43 N. E. 64) the judgment and order of affirmance were reversed, on the ground, which is gathered from the opinion of the court, that "the trial judge treated the settlement of the loss as if it were a full accord and satisfaction, and would not allow the plaintiffs to prove the facts constituting their cause of action." As that court also held that no accord and satisfaction had been established, a new trial was ordered, in order that the plaintiffs might have an opportunity of presenting their proofs in support of the charge, which is the gravamen of their suit, that the policy had been materially changed by the defendant company, without their knowledge or assent, after the property insured had been destroyed by fire, and the liability of the defendant on the policy had become fixed,—a fact which they did not discover until after the settlement of the loss. The change so claimed to have been made was the substitution of a 100 per cent. co-insurance clause for the 80 per cent. co-insurance clause which was appended to the policy when it was originally issued; and as, under the latter clause, the plaintiffs would have been entitled to receive $823.72 more than they did, this action is brought to restore the policy to its original terms, to set aside the settlement, and for the recovery of the above amount.

The plaintiffs were engaged in the wool business at Nos. 120 and 122 Wooster street, and in July, 1892, obtained from various companies a line of insurance upon their goods which were stored in the premises above mentioned. Among the policies was the one in suit for $5,000, which bears date July 18, 1892, and was issued by the defendant, a foreign corporation, through Ackerman, Deyo & Hilliard, its agents in this city. The rate of premium was $1.05 per $100, but there was an understanding that the rate would be reduced as soon as certain changes in the building which were contemplated had been made. The policy had attached to it an 80 per cent. co-insurance clause, and was in accordance with the prescribed form known as the "New York standard." The insurance was taken out by the plaintiffs through their brokers, Brown & Skinner. The policy was delivered to the latter, and was retained by them in view of the expectation that, within a short time, they would need it in order to obtain the reduction in rate which they were to apply for on behalf of the plaintiffs when the alterations

in the buildings had been completed. It appears that the New York Board of Fire Underwriters is in the habit of supplying information to insurers with respect to premium rates; under what arrangement it is unnecessary to consider. On August 22, 1892, a printed slip, described by the number 1,483, was furnished by it to the defendant's agents, containing, among others, the following item: "120–122 Wooster street. Communications with 116–118, rear; bricked up; out 35; alter to 65." On August 26, 1892, one Benjamin W. Skinner, a clerk of Brown & Skinner, plaintiffs' brokers, called at the office of Ackerman, Deyo & Hilliard, defendant's agents, and in an interview with Mr. Deyo, a member of the firm, asked for the desired reduction in the rate, which was assented to, and the amount was then and there agreed upon. Skinner wrote an indorsement on the back of the policy in Mr. Deyo's presence, which embodied the changes assented to, and handed to him a paper described as a "binding slip," which had been previously prepared in Brown & Skinner's office. This slip, which was dated the day previous, contained a declaration that the undersigned insurance companies did thereby insure Belt, Butler & Co. for the amount set opposite their respective names, subject to the conditions of standard fire insurance policy of the state of New York on stock of wool contained in 120 and 122 Wooster street, New York City, "as per policies left with companies, for a reduction in rate, binding this 26th day of August at noon." Then followed, in parallel columns the numbers of the policies, the names of the companies in typewriting, and the amounts of the policies. Opposite the names of the four companies represented by Ackerman, Deyo & Hilliard, which included that of the defendant, and under a column headed "Accepted," Mr. Deyo placed the initials of his firm, "A., D. & H." He then returned the slip to Skinner, who left the policies, with the indorsement which he had made upon the one in suit, with the defendant's agents, in order to have the changes which had been thus agreed upon stated upon the face of the instruments. The memorandum so indorsed by Skinner upon the policy was in abbreviated form, and read as follows: "63c. full co–in. cl.; building 65; stock 10; co. full clause." He denies that he wrote it, or ever saw it until the first trial of this case. I am, however, satisfied that it is in his handwriting, and prefer to accept Mr. Deyo's version of what took place at their interview rather than his. The import of this memorandum was that the net rate assented to was 63 cents. The method of arriving at this was explained by Mr. Deyo. The building rate was 65 cents. Adding 10 cents for stock, and deducting 5 cents for the sole occupancy, gives a rate of 70 cents, from which is to be deducted 10 per cent. of itself on account of the full co-insurance clause, leaving the net rate of 63 cents which was agreed upon. It will thus be observed that the nature of the co-insurance clause determined the rate of premium, and that it was therefore natural to expect in such a memorandum relating to a reduction in the premium just such a reference as was made to the co-insurance clause.

I find, then, that on the 26th day of August, 1892, there was a valid agreement between the plaintiffs, through their brokers, and the defendant company, through their agents, reducing the rate of premium to 63 cents, and, as an element of the act and as a part of the agreement, changing the co-insurance clause as above stated. On the morning of August 27th, the day following, the property insured was substantially destroyed by fire. This took place before the actual entry of the change of rate upon the face of the policy, which entry reads as follows: "Aug. 22 92. Rate reduced to 63 c. for improvements under slip No. 1,483, return premium $18.78 therefor." Slip No. 1,483 thus referred to was the circular of the New York Board of Fire Underwriters advising the change of rate, and which bore date on August 22, 1892. It was therefor proper that the indorsement giving effect to the change should bear similar date. At all events, I think it is obvious upon the evidence that there was no intention to mislead or to practice any deceit upon the plaintiffs in the adoption of this date. The new co-insurance clause was also physically attached to the policy subsequent to the date of the fire. It appears from the evidence that the business of the defendant's agents is so extensive that some days usually elapse before such a transaction as this can be physically noted upon the policy and passed

through their books. In the present case, the policy, with the changes above mentioned expressed upon its face, was not returned to the plaintiffs' brokers until some 10 days after the fire. The adjustment of the loss was a matter of investigation and determination by adjusters severally employed by the plaintiffs and defendant. In the settlement of the amount to be paid, the policy in question was treated as providing for full co-insurance; and it was upon this basis that the defendant paid to the plaintiffs, and the latter accepted, the sum of $3,294.88, which was receipted for by the plaintiffs, as the receipt itself reads, "In full settlement, compromise, and discharge of all claims and demands" for the loss which had been sustained. So far as the evidence shows, there was no dispute between the company and the plaintiffs with respect to the change in the policy either before or at the time of the payment and delivery of this receipt. The contention of the plaintiffs is that they had no personal knowledge of the change in the co-insurance clause until after the payment of the loss, and that they had never authorized their brokers, Brown & Skinner, to sanction any such change. Mr. James R. Skinner, a member of the firm, testifies that a change to the full co-insurance clause had been the subject of conversation between himself and Mr. Butler, one of the plaintiffs, and that, according to his understanding of the matter, it had been authorized. Mr. Butler denies that any such authority was given.

It may well be claimed that, under the evidence with respect to the relations between the plaintiffs and their brokers, the latter were invested with all the indicia of authority to consent to the change which was made, and that the defendant's agents were therefore justified in dealing with them on the assumption of the existence of such authority. Standard Oil Co. v. Triumph Ins. Co., 3 Hun, 591, 64 N. Y. 85; Karelsen v. Fire Office, 122 N. Y. 545, 25 N. E. 921. But, apart from that, it is plain that the plaintiffs had actual notice of the change which had taken place before the adjustment of the loss had been agreed upon, and before the payment which they accepted from the defendant and receipted for in the terms above quoted. Mr. Harris, the adjuster for defendant, testifies that, before the loss was adjusted, he went over the list of insurance with Mr. Butler, and called his attention to those policies which had 100 per cent. co-insurance clauses, and those which contained the 80 per cent. clause, and that the policy in question issued by the defendant was among the former. It also appears that the proofs of loss, signed by Mr. Butler himself, refer to and have attached to them a statement of the 100 and 80 per cent. policies, and that the defendant's policy is classified among the former. With this information before him, he should have objected then and there if he had any objection to urge such as he now makes. His silence is strongly confirmatory of the evidence of James R. Skinner that he had actual authority in the first instance to make the change. At any rate, silence under such circumstances was equivalent to a ratification of the act, and he cannot be heard now to allege the contrary. Where, then, was the fraud and deceit on which the plaintiffs rest their cause of action? The insurance upon which the loss was settled was in all respects that which had been agreed upon between them or their authorized agents and the defendant.

There seems to be nothing left except the contention that the change was not actually made either in fact or in law until after the loss had occurred. But finding, as I do, that the signing and delivery of the binding slip, and the indorsement on the back of the policy made by Skinner, took place simultaneously on the 26th day of August, the day before the fire, their cause of action is utterly without support. The binding slip and the agreement with respect to the rate of premium and the associated 100 per cent. co-insurance clause, which entered into the fixing of the rate, constituted a present contract of insurance on the new terms. Lipman v. Insurance Co., 121 N. Y. 454, 24 N. E. 699. At page 457, 121 N. Y., and page 699, 24 N. E., of the report of that case, Andrews, C. J., says: "The binding slip signed by the defendant was not a mere agreement to insure, but was a present insurance to the amount specified therein. The instrument is informal." Again (at page 458, 121 N. Y., and page 700, 24 N. E.) he says: "We think there can be no doubt that the true construction of the binding slip only

obligated the defendant according to the terms of the policy in ordinary use by the company. There is no other reasonable interpretation of the transaction. The binding slip was a short method of issuing a temporary pol cy, for the convenience of all parties, to continue until the execution of the formal one." In the case at bar the subsequent physical changes which were made on the face of the policy constituted a mere authentication in formal shape of the contract as it had been established between the parties the day before the fire. The plaintiffs contend that, by the terms of the policy as originally issued, the agents of the defendant had no power to alter it in any way except by the formal indorsements which were subsequently made upon the face of the policy. It is sufficient to say that the provision in question was inserted for the benefit of the defendant only, that it has waived it, and has adopted the act of its agents as its own. It follows from what has been said that there must be judgment for the defendant, dismissing the complaint on the merits, with costs.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, McLAUGHLIN, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

William H. Hamilton, for appellants.
Michael H. Cardozo, for respondent.

PER CURIAM. Judgment affirmed, with costs, on opinion of BEEKMAN, J., in the court below.

---

(24 Misc. Rep. 102.)

NEW YORK LIFE INSURANCE & TRUST CO. v. SANDS et al.

(Supreme Court, Special Term, New York County. June, 1898.)

1. WILLS—TRUST FUND—SETTING APART.
The conditions of a will required the executors to set apart and invest a sum to produce an income for certain life beneficiaries to be paid quarterly, the first payment to be made three months after testator's death. *Held*, that it was the duty of executors to set apart the fund immediately on testator's death.

2. SAME—NET INCOME.
By the term "net income," used to designate the amount to be paid to a life beneficiary, is meant the income after the payment of taxes, commissions, and a reasonable allowance for disbursements of the trustee in the execution of his trust, and, if the investment be in securities purchased at a premium, only such part of the proceeds therefrom can be counted as income as will leave the fund unimpaired at the maturity of the investment.

3. SAME—INVESTMENT OF TRUST FUND.
Executors empowered to invest a fund for life beneficiaries should take into consideration contingencies in the investment market that are reasonably probable within the life of the beneficiary.

4. SAME—DETERMINATION OF TRUSTEE.
The determination as to the amount of a fund to be invested to produce a specified income, reached by a trustee within the bounds confided to him by a testator, is binding on all the parties.

Action by the New York Life Insurance & Trust Company, as executor, etc., of Richard Augustine Smith, deceased, against Letitia C. Sands and others, for the construction of a will.

Duer, Strong & Jarvis (A. Pennington Whitehead, of counsel), for plaintiff.
Albert R. Genet, for defendants Gumbes and others.