**COMMERCIAL STANDARD FIRE & MARINE CO.**

v.

**BEARD WELL SERVICING CO., Inc.**

**No. 4724.**

United States Court of Appeals
Tenth Circuit.
Feb. 12, 1954.

Duke Duvall, Oklahoma City, Okl. (Dudley, Duvall & Dudley, Oklahoma City, Okl., of counsel), for appellant.

Clarence P. Green, Oklahoma City, Okl. (Walter D. Hanson, Oklahoma City, Okl., on the brief), for appellee.

Before BRATTON, MURRAH and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

This is an action by Beard Well Servicing Company, Inc., a Texas corporation, against Commercial Standard Fire & Marine Company, a corporation, to recover on an insurance policy covering damages to a cable tool well drilling machine known as a Cardwell unit. The policy included damages to the unit caused by "cratering." The parties agreed as to the amount of damages, and upon trial to the court without a jury, it was found that the damages were caused by cratering within the definition in the policy[1]. Judgment was entered for the plaintiff accordingly.

Cratering was defined in the policy as follows: "The term 'Cratering' shall be defined as the creating of a bowl shaped depression around a well caused by an eruption and/or the subsequent uncontrolled discharge of drilling fluid and/or gas and/or water and/or air and/or oil from such well or as the collapsing of the earth's structure beneath the unit."

The complaint alleged that the insured unit was being used for the purpose of swedging and cleaning Phillips Petroleum Company Nunn Oil Well No. 1 in Oklahoma City, Oklahoma; that the swedging tool was suspended by a cable within the oil well when the casing of the well became fractured at a level above the swedging tool; and that simultaneously with the separation or fracture of the casing, the structure of the earth which surrounded the casing at that point collapsed and fell into the well on top of the swedging tool, creating a weight which forced the swedging tool downwardly with such force as to damage the hoist unit at the top of the well. The defendant admitted the issuance of the policy and denied liability thereunder.

The evidence most favorable to the plaintiff shows that there was a collapse or pinching or breaking in of the well casing at approximately four thousand five hundred feet below the earth's surface. The insured unit was installed at the well for the purpose of eliminating this condition and cleaning the well and casing by a process known as "swedging". This process consists of lowering into the well a cone shaped steel device fastened on the end of a steel cable running from the power unit through a pulley at the top of the well derrick and then into the well itself. The one used by the plaintiffs was eight and five-eighths inches in diameter and weighed

---

1. The pertinent coverage in the policy reads:

"Coverage BC—To pay for any loss of or damage to the unit(s) caused by or resulting from Blowout (excluding flood) and Cratering (excluding flood) including fire resulting therefrom."

about five hundred pounds. The swedge is driven by a hammer arrangement through the narrow part of the casing and it causes the casing to be rounded to its original shape. The procedure starts with a swedge smaller than the casing size, and the size of the swedge is increased until it is approximately the same as the inside measurement of the casing.

The plaintiff followed the usual procedure in the swedging operation. The swedge passed the damaged portion of the casing and was immediately below it. A hole about five by six inches was torn in the pipe above the tool and permitted the casing to be filled from the outside. The daily drilling log described this as "a leak in pipe at 4523" feet. The weight of the material which came into the pipe pushed the swedge downward with sufficient force to pull the hoist unit from its moorings and turnbuckles, and finally to break the steel cable which had a tensile strength of sixty-four thousand pounds.

This action was brought on the theory that the earth's structure at the opening in the casing collapsed, came through the opening and piled up on top of the swedge in a column of sufficient height to create the weight and pressure necessary to force the swedge downward, and caused the damage to the unit at the top of the well.[2] It is contended that this amounted to a collapse of the earth's structure within the meaning of the policy.[3] The trial court undertook to develop a different theory. It questioned the witnesses in an attempt to show that when the casing was filled by the outside substance entering it through the opening, this necessarily created a hole or void on the outside of the casing equal in size to the amount of outside material which was necessary to fill the casing, and that such a hole or void was a crater within the meaning of the policy. We think that the evidence is insufficient to sustain either theory. If the earth's structure at the point of the fracture or separation of the casing was solid, simple physics teaches us that the pressure through a small hole at the bottom of a column would not force solid matter such as earth, up the casing to any appreciable distance, and not far enough to create the weight necessary to force the swedge downward. If the earth's structure at that point was liquid, with enough pressure to force it up in the casing the distance necessary to create sufficient weight to force the swedge downward, then there would be no void in the vicinity of the casing. If there were, the liquid in the casing would flow back down the casing out into such a void. We know not only from the evi-

2. The undisputed evidence showed that it would take a column of earth in the casing one thousand eight hundred and seventy feet high and of water two thousand four hundred and thirty feet high to create enough weight to force the swedge downward.

3. The complaint pertinent to this theory reads:

"At said time and place and while plaintiff's swedging tool was suspended by cable within said oil well, the steel casing of the well became fractured or otherwise separated at a level above that of plaintiff's said swedging tool and at a point beneath plaintiff's said hoisting unit; and simultaneously with the separation of said casing, the earth structure which had surrounded the casing at that point collapsed and fell into the well and upon the top of said swedging tool; and other parts of the earth's structure which had been situated adjacent to the casing and elsewhere in the vicinity of the casing collapsed and fell through said opening in the casing and upon said tool. Because of the quantity, mass and weight of earth which thus collapsed and fell downwardly upon said swedging tool, great and unexpected force was applied downwardly upon the cable which suspended said tool; and said great downward force was thus mechanically applied in an upward direction to said insured Cardwell hoist, said force being so great and so irresistable that it pulled said hoist unit from its fastenings and pulled it upwardly and against parts of the steel derrick of said oil well, inflicting great loss and damage to said unit and miscellaneous appurtenances thereto as herein described."

dence in the case but from common sense that the substance which entered the casing was liquid.[4] Its entry into the casing may have created a void somewhere beneath the earth's surface, but where it occurred would be pure speculation. The liquid may have flowed only through sands and this seems to be most likely as there was only a small amount of solid material immediately above the swedge.

Regardless of what may have happened far beneath the surface of the earth, the policy was not intended to cover damages resulting from any such condition. If the terms of an insurance policy are ambiguous or uncertain they will be most strongly construed against the insurer and in favor of coverage.[5] Ambiguity, however, should not be created in order to permit the application of the rule.[6] When the entire policy is considered there is no real ambiguity in its terms and the intended coverage under the crater provisions. The insured unit was on top of the earth's surface. Cratering was defined in the policy as the creating of a bowl shaped depression around the well from specified causes. Of necessity this bowl shaped depression had to be on the earth's surface. The provision upon which plaintiff relies is the collapsing of the earth's structure beneath the unit. A fair construction of this provision necessarily impels the conclusion that it meant the collapse of the earth's surface upon which the unit rested, and it cannot be stretched to include some unknown action of the earth's structure forty-five hundred feet below the surface and affecting the insured property only through a cable. We conclude the term "cratering" referred to conditions on the earth's surface. It is illustrated in the coverage provisions relating to "Blowout" and "Cratering," each of which excluded damage by floods. Floods could have taken place and caused damage to the insured property only on the earth's surface.

The judgment is reversed and the cause is remanded with instructions to enter judgment for the defendant.

---

4. The log of the operations to remove the cable and the swedge from the well showed that this was accomplished without the interference of any solid material. The witnesses described it as "good fishing" which could be done only in liquid. The recovery could not have been made through dirt. The opinion of an expert was that the hole was filled with water.

5. County Fire Ins. Co. of Philadelphia v. Harper, 207 Okl. 359, 249 P.2d 705; Great Northern Life Ins. Co. v. Cole, 207 Okl. 171, 248 P.2d 608; Combined Mutual Casualty Co. v. Metheny, 203 Okl. 522, 223 P.2d 533; New York Life Ins. Co. v. Sullivan, 191 Okl. 236, 129 P.2d 71; New York Life Ins. Co. v. Morgan, 187 Okl. 214, 101 P.2d 826; Atlas Life Ins. Co. v. Spitler, 178 Okl. 537, 63 P.2d 82; National Life & Acc. Ins. Co. v. May, 170 Okl. 198, 39 P.2d 107; Employers' Casualty Co. v. T. E. Wiggins, Inc., 168 Okl. 295, 32 P.2d 886; Commercial Standard Insurance Co. v. Bacon, 10 Cir., 154 F.2d 360; Suggs v. Mutual Ben. Health & Acc. Ass'n, 10 Cir., 115 F.2d 80.

6. National Aid Life Ass'n v. May, 201 Okl. 450, 207 P.2d 292; Sovereign Camp, W.O.W. v. Howell, 176 Okl. 451, 56 P.2d 138; Friend v. Southern States Life Ins. Co., 80 Okl. 76, 194 P. 204; Commercial Standard Insurance Co. v. Gilmore, Gardner & Kirk Oil Co., 10 Cir., 157 F.2d 929; Mandles v. Guardian Life Ins. Co. of America, 10 Cir., 115 F.2d 994.