**MIDWESTERN INSURANCE COMPANY, a Corporation, Plaintiff in Error,**

v.

**H. E. RAPP, Robert E. Rapp, and Earl R. Rapp, a Partnership, d/b/a H. E. R. Drilling Company, Defendant in Error.**

No. 36314.

Supreme Court of Oklahoma.

Jan. 31, 1956.

Rehearing Denied May 3, 1956.

Dudley, Duvall & Dudley, Oklahoma City, for plaintiff in error.

V. P. Crowe, Wm. J. Holloway, Jr., and Embry, Crowe, Tolbert, Boxley & Johnson, Oklahoma City, for defendant in error.

BLACKBIRD, Justice.

This action was instituted to recover a "loss" allegedly covered by an insurance policy, or contract. The "loss" was the damages, in the stipulated sum of $35,000 done to a portable oil and gas well-drilling rig owned by defendant in error when it fell over on its side while being loaded on a specially built truck trailer called a "low-boy", preparatory to being moved to another location from the well it had just previously been used to drill near Perry, Oklahoma.

The accident occurred January 7, 1952, only a few days after defendant in error had applied to plaintiff in error for insurance on the rig. To afford it immediate coverage, plaintiff in error issued defendant in error an instrument called a "binder", dated January 3, 1952, whose purpose was to act as temporary insurance until the policy it had purchased could be delivered. The policy did not reach the office of defendant in error until January 12th, or 5 days after the accident, though, like the binder, it was dated January 3rd. In the meantime, defendant in error had given plaintiff in error notice of its above-described loss, and, upon the latter's denial of liability and refusal to pay for said loss, defendant in error commenced this action, as plaintiff, against plaintiff in error, as defendant, to recover the rig's damages under the aforesaid binder, rather than the policy that it received after the accident. The parties will hereinafter be referred to as they appeared in the trial court.

The binder introduced in evidence at the trial provides that any loss occurring under it "shall be settled in accordance with the standard drilling rig policy issued by Rig

Insurance Underwriters." The standard policy, also made a part of the evidence, contains provisions with reference to what is termed "co-insurance", which term is explained in paragraph "V" under the portion of the policy devoted to "Definitions", as follows:

"It is expressly stipulated and made a condition of this contract that the Insured shall at all times maintain contributing insurance on the property insured by this policy to the extent of at least the specified percentage of the actual sound value at the time of the loss and that failing to do so, the Insured shall to the extent of such deficit, bear their portion of any loss. * * *"

Paragraph V, thus quoted from, begins with the following proviso in parenthesis: "This clause shall apply only where a percentage has been entered in Column 3 of Item 3 of the Declarations." The "Column 3 of Item 3" referred to is a printed square or blank space on the first page of the policy that is provided for use in writing in the percentage of the total insurance coverage that is to be co-insured. The binder contains no reference to "co-insurance" except what may be inferred from, or included in, the aforesaid provision with reference to settlement "in accordance with the standard drilling rig policy *, * *". Accordingly, one of the principal issues at the trial of the case was whether or not "co-insurance" was applicable to the loss involved.

The other principal issue was whether or not the loss, because of its cause, was one of those covered. The standard form of policy covers, among others (with certain exceptions, or "Exclusions" not material here) losses and damages from both "windstorm" and "cratering", which latter is defined as: " * * * The creating of a bowl shaped depression around a well caused by an eruption and/or the subsequent uncontrolled discharge of drilling fluid and/or gas and/or water and/or air and/or oil from such well or as the collapsing of the earth's structure beneath the unit."

At the trial, the cause of the rig's fall was not positively or unequivocally established. Some witnesses gave testimony contemplated to show that the fall may have been due to a defect in the working of the hydraulic "rams" used in the loading operation caused by an incorrect method of "bleeding" the air from them immediately beforehand, while others gave testimony contemplated to show that the fall was due to a combination of wind force and "giving way" of the ground under one leg or side of the derrick. This issue was submitted to the jury to be determined, under the court's instructions, by answering the following interrogations:

"1. Do you find from a preponderance of the evidence that the damage and loss sustained by plaintiffs was proximately caused by 'wind storm', as defined in the instructions?

"2. Do you find from a preponderance of the evidence that the damage and loss sustained by plaintiffs was proximately caused by 'cratering', as defined in the instructions?

"3. Do you find from a preponderance of the evidence that the damage and loss sustained by plaintiffs was proximately caused by the two elements, 'wind storm' and 'cratering', acting together coincidentally as those terms have been defined in the instructions?

"4. Do you find from the evidence that the damage and loss sustained by plaintiffs was caused by a defect in the machinery or equipment being used by plaintiffs, or a failure of such machinery or equipment (t)o per(o)perly perform, or was due to some other cause other than 'windstorm' or 'cratering', as those terms have been defined in the instructions?"

The only answer to any of the above interrogations that was incorporated in the verdict the jury returned, was an affirmative answer to Interrogatory No. 3.

After the jury's verdict, the issue of whether the "co-insurance" feature of the standard policy applied to the loss involved

was tried to the court without a jury. In accordance with the jury's above-described determination on the first issue and the court's determination on this latter issue, judgment was entered for plaintiffs in the full amount of the loss. The defendant thereafter perfected the present appeal.

■ Defendant's argument for reversal appears in its briefs under seven propositions. Because of its fundamental bearing upon some of the other propositions, we consider first defendant's Proposition VII, which is to the effect that plaintiffs' cause of action, if any, should have been based upon the policy of "permanent" insurance it issued plaintiff, rather than upon the "temporary" binder. Defendant's argument under this proposition is worthy of little consideration. It is not only ambiguous—it is self-contradictory. Counsel first refers to the binder providing that the insurance afforded thereunder shall become void upon *delivery* of a policy. They follow this with the statement that said provision shows that when the policy is *"issued, the binder is voided * * *"*. (Emphasis ours). The first, rather than the last statement, is correct. The true and exact wording of the binder's provision referred to in said argument is: "This insurance is made binding upon the mutual agreement that it shall at once terminate and become void upon delivery of policy (policies) in substitution * * *". Though, as hereinbefore mentioned, the policy was dated January 3rd, just as was the binder, and the evidence does not establish just when the policy was "issued", it is undisputed that it was not delivered to defendants until after the loss occurred. Therefore, the binder was the only contract of insurance in force and effect on the date of the loss, just as was held to be the case in Republic Insurance Co., Dallas, Tex. v. French, 10 Cir., 180 F.2d 796. Having thus concluded that the parties' rights are governed by this contract, we need not discuss nor consider the policy's effect on any such right that is expressly fixed by the provisions of the binder.

■ Accordingly, the only definition of "cratering" proper to consider in connection with defendant's argument under its Proposition I that the "evidence was wholly insufficient to establish cratering" is the one, hereinbefore quoted, that is set forth in the standard policy, whose provisions, rather than those of the policy subsequently delivered to plaintiff, are the only ones that the binder makes applicable to the loss herein involved. In their argument, defense counsel first seek to focus attention on the first part of that definition, and to show that to constitute "cratering" thereunder, it is necessary that a "bowl shaped depression" be created around the well. They point out that none of the evidence in this case showed that the "cratering" which the jury, by its answer to Interrogatory No. 3, determined was one of the causes of the derrick's falling, was the creating of a "bowl shaped depression around" the "well". Then they cite Commercial Standard Fire & Marine Co. v. Beard Well Servicing Co., Inc., 10 Cir., 210 F.2d 560, as authority for their contention that, without such evidence, the jury's verdict lacks sufficient support. The cited case is no authority for this contention. With reference to the type of depression comprehended in the definition here involved, it held only that the depression or collapse had to occur on the earth's surface rather than 4,500 feet down in the well, where the alleged "cratering" occurred in that case. We think that in view of the plain wording of the definition in question, "cratering" includes *either* the "creating of a bowl shaped depression around a well" from any of the causes specified therein, *"or * * * the collapsing of the earth's structure beneath the unit."* Defense counsel further argue that the evidence also shows that the only hole or depression in the earth under the side of the derrick toward which it fell was caused by mashing, shoving, pushing, squashing or "squelching" from the weight of the rig, as distinguished from a "collapse" of the earth's surface as that word is usually defined. They say that no witness testified that the surface or structure of the ground "gave way causing the rig to weave and fall." This statement is true only to the extent hereinbefore indicated,

namely, that no witness purported to see and know exactly what did *cause* the fall. However, at least one witness, Billy V. Burton, a floorman on the drilling crew, testified that he inspected the situation immediately after the accident and further testified that "—sometime during the procedure (evidently meaning the tilting and retraction of the derrick) the ground gave way underneath these matting boards * * * (which he had just explained were the boards that always lay across the ground between it and the sub-structure of a standing derrick)." The witness, William O. Timberlake, one of the engineers of the International Derrick & Equipment Company, the rig's manufacturer, testified that "a loss of foundation" combined with a gust of wind blowing 20 miles per hour would be sufficient to make such a rig fall when it is in the process of being loaded and is tilted at an angle of forty-five degrees, as was the case here. We think the jury was warranted in concluding, on the basis of such evidence and the reasonable inferences to be drawn therefrom, that the rig's fall was caused by the gusty wind acting in concert with the collapse of some of the ground under the rig's footing. More than one expert witness testified that when the wind is blowing in intermittent gusts (as it was at the time of the accident) it exerts a greater force to cause such a fall than a steady wind of the same velocity. We think the foregoing sufficiently demonstrates that the jury's conclusion cannot be said to be without any competent evidence reasonably tending to support it. See Ellison v. Walker, Okl., 281 P.2d 931, and Valley Steel Products Co. v. Long, Okl., 282 P.2d 232.

■ Defense counsel argues further, however, that the jury's failure to set forth in its verdict an answer to any of the four interrogatories, except the third one, was tantamount to an express finding against the plaintiff on the other three, citing Tobin v. Gantt, 78 Okl. 73, 189 P. 170. We do not agree. The jury's affirmative answer to the question as to whether plaintiff's loss and damage was proximately caused by both "windstorm" and "cratering" acting coincidentally, necessarily implied a negative answer to the other interrogatories. If the jury had given affirmative answers to either of the latter, it could not have given its affirmative answer to Interrogatory No. 3 without rendering its verdict ambiguous and self-contradictory. We think its affirmative answer to that interrogatory made the giving of any answer to the others unnecessary and immaterial. In this connection see the fourth paragraph of the syllabus in Tobin v. Gantt, supra, and 89 C.J.S., Trial, § 558.

■ Under their Proposition III, defense counsel argue that the trial court erred in refusing to allow the introduction in evidence of a United States Department of Commerce pamphlet to the effect that a 20 mile per hour wind is properly classified as a "fresh breeze." It is said that this pamphlet was admissible as an aid to the jury in determining whether the wind was strong enough to have caused the rig's fall. The argument that the pamphlet's exclusion was prejudicial, and reversible error, is based both on the fact that the court allowed the plaintiffs to introduce evidence describing the wind and its velocity, and counsel's stated belief that since the jury failed to answer Interrogation No. 1, it was in serious doubt as to whether the wind was of sufficient force to have caused the rig's fall. Plaintiff's counsel say that it is immaterial whether the wind involved constituted a "hurricane, tornado or fresh breeze in the opinion of the Department of Commerce's meteorologists * * *". They further say that the exclusion of such evidence was not prejudicial and consequently not reversible error under the long established rule previously adhered to by this Court. With the latter we agree. We are unable to concur in defense counsel's asserted "belief" with reference to the effect on the jury's verdict of excluding the evidence in question. Their argument, and our examination of the record, falls far short of demonstrating that the alleged error was prejudicial or that the verdict and judgment would have been different if the excluded pamphlet had been admitted. Especially is this true in view of the jury's finding, not that the wind alone, but that the wind in concert

with the cratering of the earth caused the rig to fall, (and in view of testimony that a wind as slow as 20 miles per hour velocity, if coming in gusts, is enough to accomplish such a result). The alleged error, if any, must therefore be regarded as harmless. See Layton v. Purcell, Okl., 267 P.2d 547.

Defendant's Propositions IV and V, pertain both directly and indirectly to written statements a Mr. Hal Johnson, who investigated the accident for defendant, took from Messrs. C. W. McDowell and Wayne Adams, members of plaintiff's rig crew, on January 9th and 10th, respectively, after defendant received notice of the rig's fall and before its denial of liability for plaintiff's damages therefrom. After the taking of these statements, each of which appears to have been signed before Johnson as a Notary Public (although Mr. McDowell later denied having read the statement attributed to him, before signing it) Mr. McDowell's deposition was taken. During its taking, counsel for defendant sought to impeach some of the testimony he was thus giving, by showing that the above-described "Affidavit" contained certain statements contrary thereto. When, as part of defendant's evidence, McDowell's deposition was read at the jury trial, the court sustained plaintiff counsel's objection to the introduction of the cited portions thereof. Defense counsel then sought to introduce Mr. McDowell's "Affidavit" to impeach his deposition. The Court also prohibited this. Later, at the close of T. H. Van Wagoner's testimony, defense counsel sought to introduce both of the "Affidavits", or ex parte statements, for general purposes, and the court again sustained further objections by plaintiff's counsel.

▉ Under their Proposition IV, defense counsel argue that the above-described ex parte statements constituted admissions against interest by plaintiff through agents or employees and were admissible as direct evidence of the cause of the rig's falling. In support of this argument, they cite a paragraph in the standard form of policy (made applicable as hereinbefore indicated, by the binder) dealing with "Proof Of Loss" which provides, among other things, that within 60 days

"after loss or damage * * *" the Insured shall not only "render" his sworn statement concerning his knowledge and belief as to the cause of the loss or damage, but "as often as required * * * shall cause employees to submit to examinations under oath by any person named by this company, and subscribe to same. * * *". We agree with counsel for plaintiff that the inclusion of the quoted provision in the policy to aid the insurer in determining whether the insured has suffered a loss, as a preliminary to passing on his claim, does not vary or affect in any way the hearsay rule which renders inadmissible in court trials sworn statements or affidavits such as the ones in question are said to be. See In re Free's Estate, 181 Okl. 564, 75 P.2d 476; Staley v. South Jersey Realty Co., 83 N.J.Eq. 300, 90 A. 1042, L.R.A.1917B, 113, Ann.Cas. 1916B, 955; Am.Jur. Vol. 1, "Affidavits", Sec. 30, Vol. 20, "Evidence", Sec. 456.

▉ Under their Proposition V defense counsel refer to the trial court's above-described refusal to allow the affidavits' introduction in evidence for the purpose of impeaching those portions of McDowell's deposition, that they were allowed to introduce, and the court's exclusion of those portions of the deposition itself wherein McDowell was asked about conflicting statements appearing in his so-called "Affidavit". They say that this was error and assert that the question of whether or not it was proper to impeach McDowell is not before this Court, but merely the question they state as follows: May or may not that portion of the deposition relating to surprise and impeachment be employed by the surprised party at the time the deposition is read at the trial? Respective counsel cite, and we know of, no Oklahoma case determinative of the precise issue here presented. However, we think there is no distinction, on principle, between this case and Hayes v. Kansas City Southern Ry. Co., Mo., 260 S.W.2d 491; and that case seems to be in general accord with the weight of authority. See 16 Am.Jur., "Depositions", sec. 114, Note 10; Annotations 134 A.L.R. 212, 229, et seq. On the basis of the holding in that case, the court's

exclusion of the affidavits and the portion of McDowell's deposition by which it was sought to impeach other portions of his deposition, was not error.

Under its Proposition VI defendant contends that the trial court erred in fixing, by its judgment, plaintiff's recovery for *all* of the damages to the rig, which, according to the stipulation hereinbefore noted, was $35,000—rather than limiting the judgment to $20,588.33 as its counsel say is all plaintiff would have been entitled to if "coinsurance" is applicable to all, or 100 percent of the loss. In their argument in support of this contention, they cite the binder's provision (hereinbefore referred to) that: "Any loss occurring under * * (it) shall be settled in accordance with the standard drilling rig policy issued by Rig Insurance Underwriters." They say this provision (in accord with the general rule) binds defendant to pay for no greater part of plaintiff's loss than do the policies it sells on similar risks. Our attention is directed to the evidence defendant introduced to show that in recent years Rig Insurance Underwriters, and other companies insuring the type of risk here involved, have not done so for the full extent of the loss—that their policies have all made coinsurance applicable to at least 90 percent of the loss, even where they have appraised the insured equipment and, by said appraisal, found its value sufficient for the amount of the policy; and that where there has been no appraisal, nor opportunity for one (as was the case here before the loss occurred) coinsurance is usually, if not always, made applicable to 100 percent of the loss. Plaintiff relies on the provision of Paragraph V of the standard form of policy (hereinbefore referred to) that the coinsurance clause therein "shall apply *only* where a percentage has been entered in Column 3 of Item 3 of the Declarations", and to the fact that "Column 3 of Item 3 of the Declarations" in the standard form is blank and has no words, figures, abbreviations, or anything else in it to indicate that the coinsurance clause is to apply to any portion of any loss thereunder.

The above-described evidence tending to show that neither Rig Insurance Underwriters, nor the companies competing with it for insurance business of the type here involved, issues such insurance without specific provisions in their policies making coinsurance applicable to either 90 or 100 percent of the loss, was obviously introduced by defendant in an attempt to bring this case within the rule stated in Republic Insurance Co., Dallas, Tex. v. French, supra, as follows, 180 F.2d at page 798:

> "* * * generally, in the absence of express agreements contained in the binder, it binds the insurance company to pay losses occurring before the policy is actually issued *in accordance with the terms and conditions of* policies ordinarily issued by the company to insure like risks." (Emphasis ours.)

The quoted statement was preceded in the opinion in that case by the statement that "an insurance binder in Oklahoma is a recognized liability on a forthcoming insurance contract during negotiations therefor", citing Hayes v. Charter Oak Fire Ins. Co., 193 Okl. 617, 145 P.2d 941. That statement, as phrased, was unfortunate. It implies, without warranted basis, that in this State a binder can be nothing more nor less than a recognized liability on a forthcoming insurance contract; but the opinion in that case shows, by the result it reaches, that a binder may be more than that—that it may be the *only* contract of insurance between the parties if a loss occurs under it before the "permanent" policy is issued, especially in regard to matters wherein the policy, later issued, differs from the binder. And, such a holding is supported by the weight of better-reasoned authorities. For instance, in Mutual Fire Ins. Co. of Montgomery County v. Goldstein, 119 Md. 83, 86 A. 35, 36, Ann.Cas.1914C, 723, the court said:

> "The learned judge below very properly states that the *ordinary* binding slip 'is an executory agreement to issue a policy in the form the insurer is accustomed to issue, and furnishes indemnity to the assured, pending action upon his application by the insurer, subject to the terms and conditions contained in such policy'; but he observes:

with equal propriety that' it does not follow, because insurers are accustomed to issue executory contracts, that they cannot make executed contracts for temporary insurance. * * *,' holding, as he did, that the plaintiff's application in this case, together with the certificate issued to him, formed an executed contract for temporary insurance, he followed logically to his conclusion that the conditions of the policy issued and tendered, *after the loss had occurred,* could not be read into the executed contract. This view, based upon the peremptory language of this particular certificate, is so simple and so fully in accord with settled legal principles governing the making and construction of contracts that it does not seem that argument or authority is required for its acceptance."

Despite the quoted indication of a lack of necessity therefor, the court, in the above case, went on to demonstrate, both by citation of authority and discussion the soundness of its holding that there was a contract of insurance which the company could not "vary by issuing a policy containing a clause" not referred to in the application therefor. The law on this subject is no different in Oklahoma. The principles applicable to contracts of the character of the one in question are the same here as in Maryland. Defense counsel point out no particular, except as it pertains to coinsurance, in which the binder involved does not possess all of the essential elements of a valid executed contract for temporary insurance, see the Annotations to Mutual Fire Ins. Co. v. Goldstein, supra, Ann.Cas. 1914C., at page 729, as distinguished from an executory contract for "permanent" insurance, or a recognition of liability "on a forthcoming insurance contract." The binder here is more than a note or memorandum looking toward a future contract. Its provisions, when considered with those of "the standard drilling rig policy issued by rig insurance underwriters" (which, by its reference thereto, are, in effect, incorporated therein) constitute a complete and comprehensive contract of present insurance (as well as a contract for the subsequent issuance of a policy). In this connection, see Belt v. American Central Ins. Co., 29 App.Div. 546, 53 N.Y.S. 316, and Cyclopedia of Insurance Law, Couch, Vol. 1, p. 165, Note 18, citing Albers v. Security M. L. Ins. Co., 41 S.D. 270, 170 N.W. 159. As it differs in this respect from many binders, the rule hereinbefore cited in defendant's argument does not apply. Fisher v. Underwriters at Lloyd's London, 7 Cir., 115 F.2d 641, and other cases cited therein are not applicable. They all involved less comprehensive binders than the one here involved. Those binders omitted the terms in litigation so that a former policy, or the usual one issued to cover risks similar to the ones involved, were correctly resorted to in determining the parties' agreement. Here, the parties' contract was not without specific provision as to coinsurance. That term of the contract was completely provided in the binder's specific incorporation of the standard form of policy. The standard form specifically provides for just such a case as this, where there was no agreement as to the percentage of the loss to which coinsurance would be applicable. It provides that unless such percentage is specified in "Column 3 of Item 3 of the Declarations" the coinsurance clause will not apply. The author of that provision was not the plaintiff; it was an insurance official who admitted on the witness stand that it could have been worded better. In view of this, and the completeness of the contract, and the comprehensiveness of its provisions, and the superior position of defendant's agent to know them, we think that if the contract defendant made with Earl Rapp (for plaintiff) was to be limited by the coinsurance clause, its agent should have specifically inquired about that when he took Rapp's oral application for it, or it should have been specified in the binder. In this connection, see the second paragraph of the syllabus, and the discussion, in Mutual Fire Insurance Company v. Goldstein, supra. We think the testimony by which defendant sought to show that the two men discussed the matter of coinsurance, and that there was an agreement between them that coinsurance was to be applicable to the contract here involved, to

the same extent that it was written into a former policy, was an attempt to vary, by parole, the terms of a complete written contract; and was therefore inadmissible. See Ross v. Stricker, Okl., 275 P.2d 991, and Foster v. Atlas Life Ins. Co., 154 Okl. 30, 6 P.2d 805, discussed therein. But assuming that such testimony was admissible, we do not think the trial court's judgment was contrary to the evidence. In view of what the evidence indicates as to the various types of risk and equipment which may or may not be covered by policies of the character here involved, and, in view of Mr. Rapp's testimony as a whole, even if, as defendant's agent testified, he did tell him that plaintiff wanted the same "coverage" it had had before (under a policy that had previously expired) we do not think the inference that the new policy was to be the same as the old one on the coinsurance phase, is necessarily a reasonable one or the only reasonable one to be drawn from such testimony, of and by itself, and without any evidence to indicate that the word "coverage" as used in the parties' conversation related to "coinsurance" as distinguished from other matters usually comprehended or encompassed by that term.

The only comment we deem necessary on defendant's evidence to show that neither rig insurance underwriters nor other companies writing insurance of the character involved here, issue such policies without coinsurance being applicable thereunder, is that such evidence was inadmissible as an attempt to "vary, add to or contradict the plain, definite and unambiguous terms of" a written contract by evidence of usage or custom. Rence v. Blubaugh, Okl., 285 P.2d 414. Even some of the leading cases dealing with binding slips insufficient as complete contracts, and applying the "ordinary policy in use" rule, hereinbefore referred to, recognize (just as does that rule itself) this rule of evidence. For instance, see Lipman v. Niagara Fire Ins. Co., 121 N.Y. 454, 455, 24 N.E. 699, 701, 8 L.R.A. 719, 722, where the court said:

"* * * even if a custom of that kind had been proved, * * * it would have been inadmissible to change or extend the explicit language of the contract."

Nor do we think there is any merit to defendant's last contention under its Proposition VI, that plaintiff is estopped to deny that coinsurance is applicable to the loss here involved. As a claimed basis for application of this doctrine, they cite proof that plaintiff failed to reject the policy that was delivered to it after this loss, that said policy had "100%" typed into Column 3 of Item 3 of its "Declarations", and that subsequent to this loss, plaintiff suffered another loss on different property covered by the policy, and accepted defendant's offer to settle this latter loss at a sum or figure derived by application of the 100% coinsurance provision. The short answer to this is that the insurance contract involved here is a different contract, with reference to coinsurance, than the one under which the cited settlement was made. If such settlement had been made while the binder or contract, here involved was in effect and before the loss involved here occurred, then there might be some merit to the argument that this evidenced plaintiff's ratification of defendant's insertion of "100%" in Column 3 of Item 3 of the "Declarations" in the policy it delivered to plaintiff, or was evidence that 100% coinsurance was contemplated in the parties' original contract—but that is not this case. Here, the loss occurred and was compensable under the binder—the contract in force at that moment—before plaintiff had ever received or anyone employed by it had ever read the policy upon which defendant's claim of estoppel is based, and before plaintiff did, or had much opportunity to do anything to estop it from enforcing it. This is in accord with the principles followed and discussed in May v. Hartford Fire Ins. Co., 2 Cir., 297 F. 997; Baker v. North River Ins. Co., 112 Kan. 530, 212 P. 118; Alliance Ins. Co. v. Continental Gin Co., Tex.Com.App., 285 S.W. 257, and other cases cited in the Annotations at 83 A.L.R. 298, 306, 307, 315. The second syllabus of National Fire Ins. Co. of Hartford v. McCoy, 205 Okl. 511, 239 P.2d 428, cited by defendant, is therefore inapplicable. Nor is Eagle Star & British Dominion Ins. Co.

v. George A. Moore & Co., 9 Cir., 9 F.2d 296, where (as the opinion therein plainly shows) there was no controversy over the terms of the insurance involved.

Affirmed.

JOHNSON, C. J., and CORN, DAVISON and HUNT, JJ., concur.

WILLIAMS, V. C. J., and WELCH, HALLEY and JACKSON, JJ., dissent.