**DYER**

v.

**FIDELITY–PHENIX FIRE INS. CO. OF NEW YORK.**

**Civ. A. No. 3292.**

United States District Court
E. D. Louisiana, New Orleans Division.

Dec. 17, 1953.

Cobb & Wright, Herman M. Baginsky, Morris Wright, Joseph V. Ferguson II, New Orleans, La., for plaintiff.

R. W. Williams, Jr., Baton Rouge, La., for defendant.

WRIGHT, District Judge.

The primary question presented by this litigation is whether the damage to one of the oil well drilling rigs operated by plaintiff resulted from a "blowout" or a "kick", the policy sued on not covering damage caused by a "kick".

The problem is simplified to some extent by the decision of the Court of Appeals for the Fifth Circuit in Georgia Home Ins. Co. v. Means, 186 F.2d 783, 784, which held that an incident similar to the one in suit was a "blowout". The pertinent provision of the policy here,[1] however, is not identical with the policy in the Means case.[2] In Means, the policy made no reference to a "kick", whereas here the policy, after defining "blowout", reads: "It is understood and agreed that a 'kick' as commonly referred to in the drilling of a well which may result in a drill stem being stuck shall not be termed a 'blowout' as above described." Here, too, the policy in de-

1. Paragraph 5 of the policy reads:
"The term 'blowout' shall be defined as a sudden expulsion of drilling fluid, not excluded otherwise by this policy, followed by an uncontrolled flow of oil, gas or water from the well that occurs when the pressure entering the well at some depth below the surface is greater than the pressure exerted by the column of drilling fluid in the well, resulting in the complete lack of control of the well or drilling operation. (This definition does not apply to cable tool rigs or spudding units.)

"It is understood and agreed that a 'kick' as commonly referred to in the drilling of a well which may result in a drill stem being stuck shall not be deemed a blowout unless such 'kick' is immediately followed by a blowout as above described."

2. The definition of "blowout" in the Means policy follows:
"The term 'Blowout' shall be defined as a sudden expulsion of drilling fluid (mud, water and sometimes oil) followed by an uncontrolled flow of oil, gas or water from an uncompleted well that occurs when the pressure of oil, gas or water entering the hole at some depth is greater than the pressure exerted by a column of drilling fluid in the well."

fining "blowout", after following the Means definition, concludes with the phrase "resulting in the complete lack of control of the well or drilling operation." The defendant insurer insists that the difference in the policy provisions requires a different result.

A "kick" is not defined in the policy, but the parties are agreed that a "kick" may be defined as that action which takes place when more mud is being recovered out of the well bore than is actually being forced into the drill stem by the well's circulating system.[3] This abnormal recovery is caused by gas, oil or salt water pressure from some strata underneath the surface of the earth. Using this definition, the facts of this case show that the incident in question was not a "kick" but a "blowout" as defined in the policy and interpreted in Georgia Home Ins. Co. v. Means, supra. The phrase "resulting in the complete lack of control of the well or drilling operation" adds nothing to the definition of "blowout" as contained in the Means policy, since the policy there, as here, in defining "blowout", refers to an "uncontrolled flow of oil, gas or water from an uncompleted well * * *."

On February 6, 1951 plaintiff was engaged in drilling an oil well known as Veeder-Hunt No. 1 in the Charenton Oil Field, Parish of St. Mary, Louisiana. Contract depth for the well was 11,500 feet. While drilling in a sand formation at a depth of 10,973 feet, the tool pusher noticed that the mud pits were filling up, indicating that more mud was coming out of the hole than was being pumped in. Realizing that the drill stem had encountered a sub-surface formation which was exerting more pressure on the column of drilling fluid than the hydrostatic pressure from the mud pump was exerting on the formation, the tool pusher began to weight up his mud in an attempt to control the sub-surface formation pressure. The rate of return of the mud increased, however, and fluid began to spurt up over the bell nipple at the top of the casing and on to the derrick floor. Fearing a violent eruption of mud and gas, the tool pusher ordered the "blowout" preventors closed. After closing the "blowout" preventors, rotation of the drill pipe was resumed. The movement of the pipe damaged the rubber bushings in the "blowout" preventors and further working of the drill stem had to be abandoned.

Efforts to equalize the circulation of the drilling fluid continued, but the pressure from the sub-surface formation persisted to such an extent that, after cleaning the well of drilling fluid, sand and shale, finally pure gas alone was expelled. The velocity of the gas being expelled was so great that the noise could be heard some distance away from the well.

Halliburton men[4] with their equipment arrived in the late afternoon of February 6 and began pumping heavy mud at 4000 pound pressure into the well the following day. Pressure in excess of 4000 pounds was not used for fear of damaging the valves and the drill stem itself. At that pressure very little drilling fluid could be introduced into the hole because of the reverse pressure from the sub-surface formation. The well continued to clean itself of the

3. Mud or drilling fluid, after being introduced into the drill stem under hydrostatic pressure, proceeds down the drill stem, through openings in the drilling bitt, up the sides of the hole, and out into the mud pits. As it proceeds back into the mud pits, it is cleansed of drill cuttings and prepared for reintroduction into the drill stem. This mud or drilling fluid, in addition to assisting the bitt, keeps the drill stem free from interference from the sides of the bore as well as from sub-surface pressures which inhere in the formations through which the well is cut. In normal operation, the amount of mud introduced into the drill stem is the same as the amount of mud reclaimed from the well. In other words, a continuous even circulation of drilling fluid is maintained.

4. Halliburton men are specially trained and equipped to fight wells which have gone out of control.

drilling fluid, shale and gas until finally a hole or washout appeared in the drill stem at approximately 2500 feet. The hole in the drill stem was apparently caused by the pressure from the Halliburton pumps. The well was then killed by the insertion of a cement plug at 3000 feet in order to prevent additional gas from escaping. After the well was killed, 1450 feet of drill pipe was recovered from the hole. Nine thousand three hundred ninety-three feet of drill pipe, four drill collars, one drill sub and one rock bitt were abandoned in the hole.

Only one expert on oil field operations was produced. After defining a "kick", he testified that in his opinion the well in question first experienced a "kick" and then blew out. The evidence supports that conclusion. The well was never under control from the time the "blowout" preventors were applied. Unquestionably, the well would have gone wild if that preventive step had not been taken. The fact that it was taken, thereby avoiding greater loss, should not defeat plaintiff's recovery. To so hold "would put a premium on careless operation".[5] The undisputed evidence shows that there was a sudden expulsion of drilling fluid from the well followed by an uncontrolled flow of gas, that the pressure of the gas entering the hole from a subsurface formation was greater than the pressure exerted by the column of drilling fluid in the well. This underground pressure finally caused the hole to collapse or bridge over around the drill stem, bringing an end to the drilling operations and resulting in the loss of a substantial part of the drill stem.

If a "blowout" had not occurred, it would have been possible to bring the well under control after the initial "kick". The effect of a "kick" is overcome by the use of heavier mud at higher pressure so that the pressure formation is sealed off and circulation of the drilling fluid restored. When the underground pressure, however, is so great that it cannot be sealed off and thus controlled, the resulting loss is caused by a "blowout" rather than a "kick". So it was here.

On the question of damages there is considerable dispute. Plaintiff contends that the drill pipe lost in the well was appraised by the defendant at $4 a foot when the policy was issued some months prior to February 6, 1951. Plaintiff, therefore, would have that valuation placed on the drill stem. The insurer, on the other hand, argues that there is no showing that the drill stem appraised by its agent is the same as the stem lost in the well. It argues further that even if it be the same, its actual value does not exceed $2 a foot.

There can be no serious question that the drill stem lost in the well is the same as that which was appraised by the insurer. It is true that, when appraised, the drill stem was at another location, but plaintiff has satisfactorily accounted for the movement of the drill stem from its prior location to Veeder-Hunt No. 1. It may be that several of the sections of the stem have been replaced, but it is clear that the stem is essentially the same. The stem, however, has depreciated at least to some extent between the time of its appraisal by the insurer and its loss at Veeder-Hunt No. 1. Consequently, the valuation of $3.50 per foot would be a fair one. In addition to 9,393 feet of drill stem lost in the well, plaintiff also lost four drill collars valued at $3,600, one drill sub valued at $110 and one rock bitt valued at $172. He should also be reimbursed for the "blowout" preventor packing valued at $107 which was destroyed in use at the well.

Under the Sue and Labor clause of the policy, plaintiff makes certain claims. Under this provision, plaintiff is entitled to reimbursement of a proportion of all reasonable expense incurred in preserving and saving the property insured, the proportion to be determined by a formula set out in the policy. The reasonable expense incurred by the plain-

---

5. Georgia Home Ins. Co. v. Means, 5 Cir., 186 F.2d 783, 785.

tiff in preserving or saving the property insured is as follows: Wages, Unemployment Insurance, Workmen's Compensation Insurance $1,700; Fuel for Rig $700: Dia-Log Service $550; Transportation of Wash-pipe $127; Depreciation $700. In arriving at the above figures it was determined that the work performed and expense incurred at the wellhead after February 13, 1951, the day the well was killed and a portion of the drill stem recovered, were not covered by the policy since such work performed and expense incurred cannot be attributed to the "blowout". They relate to normal clean-up which would be required at the end of any drilling operation.

Plaintiff makes an additional claim for penalty and attorney's fees under the Louisiana statute[6] providing that where failure of the insurer to make payment under the policy within sixty days after receipt of proof of loss is found to be arbitrary, capricious or without probable cause, the insured is entitled to 12% damages and reasonable attorney's fees. Since the facts of this case demonstrate that the insurer's refusal to pay was neither arbitrary, capricious nor without probable cause, no penalty or attorney's fees will be allowed.

Judgment accordingly.