FIDELITY–PHENIX FIRE INSURANCE COMPANY OF NEW YORK,
Appellant & Appellee,

v.

Otis W. DYER, Jr., Appellee & Appellant.

Otis W. DYER, Jr., Appellee & Appellant,

v.

FIDELITY–PHENIX INSURANCE COMPANY OF NEW YORK, Appellant & Appellee.

No. 15065.

United States Court of Appeals,
Fifth Circuit.

April 6, 1955.

J. Elton Huckabay, Robert W. Williams, Jr., Baton Rouge, La., for appellant and appellee.

Joseph V. Ferguson, II, New Orleans, La., Cobb & Wright, New Orleans, La., for appellee and cross-appellant.

Before HUTCHESON, Chief Judge, HOLMES, Circuit Judge, and DAWKINS, District Judge.

DAWKINS, District Judge.

Presented here are cross appeals from a judgment in an action under the "blowout" provisions of an insurance policy issued to a drilling contractor and providing coverage on an oil well drilling rig and appurtenances. The insured, Dyer,[1] brought the suit for the alleged value of equipment lost or damaged as a result of an occurrence at an oil well and for "sue and labor costs", praying for judgment in the sum of $20,050.84,[2] plus statutory penalties and attorney's fees. The trial judge held[3] that what occurred at the well was a "blowout" within the policy definition and gave judgment for plaintiff in the amount of $15,187.00 but denied the penalties and attorney's fees on the ground that defendant's refusal to pay was "neither arbitrary, capricious nor without probable cause."

Here each party relies heavily upon the opinion of this Court in Georgia Home Insurance Co. v. Means, 5 Cir., 186 F.2d 783, 784, which was also for damages resulting from an alleged "blowout" under a policy definition. In its appeal, this defendant insurer argues that both the facts and the policy provisions are clearly different from those in the Means case; while Dyer urges upon us his appreciation of the two cases as identical. The latter is so certain of his position he argues with some vigor that in the light of the Means decision, defendant had no conceivable grounds for denying coverage and should have been cast for statutory penalties and attorney's fees. He further contends that there is no basis in fact for the trial court's evaluation of the drill stem lost at a figure less than that alleged or for the refusal to allow sue and labor expenses in full.

There are some differences in the wording of the applicable policy provisions in the Means case[4] and the policy sued on here.[5] The variations indicate an attempt on the part of defendant to provide a more precise or limited definition of the term "blowout", and particularly to distinguish it from a "kick", which was not mentioned in the Means policy. These differences in wording caused the defendant to deny liability and gave rise to this suit.

The reported opinion of the trial court states in some detail the facts as to what actually happened at the well, and

1. For convenience, the parties to these appeals will be referred to herein either by name or as "plaintiff" and "defendant", according to their status in the trial court.

2. This was over and above the $25,000 deductible provision of the policy.

3. Dyer v. Fidelity-Phenix Fire Insurance Co. of N. Y., D.C., 117 F.Supp. 104.

4. " 'The term "Blowout" shall be defined as a sudden expulsion of drilling fluid (mud, water and sometimes oil) followed by an uncontrolled flow of oil, gas or water from an uncompleted well that occurs when the pressure of oil, gas or water entering the hole at some depth is greater than the pressure exerted by a column of drilling fluid in the well.' "

5. "The term 'blowout' shall be defined as a sudden explosion of drilling fluid *not excluded otherwise by this policy*, followed by an uncontrolled flow of oil, gas or water from the well that occurs when the pressure entering the *well* at some depth below the surface is greater than the pressure exerted by the column of drilling fluid in the well, *resulting in the complete lack of control of the well or drilling operation*. (This definition does not apply to cable tool rigs and spudding units.)

"*It is understood and agreed that a 'kick' as commonly referred to in the drilling of a well which may result in a drill stem being stuck shall not be deemed a blowout unless such 'kick' is immediately followed by a blowout as above described.*" (Emphasis supplied to indicate material variances from the definition in the Means case.)

we deem it unnecessary to repeat them here. We should, however, observe that defendant questions the finding, 117 F. Supp. 106, that the pressure from below cleaned the well of drilling fluid. It correctly points out that shortly after the initial loss of normal circulation, even though progressively less fluid was being expelled from the well, the workmen were pumping in more and more mud; and the driller testified that in the course of this activity he lost two pits of mud somewhere below the surface.

Defendant contends that these facts, not revealed by the trial court, show that "dry" gas was being expelled because the mud being pumped in was not reaching the gas formation at the bottom of the well; that the conclusion that the pressure from below was sufficient to clean the well of drilling fluid is clearly erroneous. This contention leads defendant into urging that there was no "sudden expulsion" and that the pressure from below was never of sufficient force to have caused a "blowout". Therefore, it argues, what occurred was a "kick", expressly excluded from coverage, which never resulted in "complete lack of control of the well or drilling operation" within the meaning of the policy definition.

■ This court will not presume even to attempt a precise definition of the terms "blowout" and "kick" when it so clearly appears that the efforts to do so by experts in the drilling of oil wells have been unsuccessful. We can only look to the record in this case to determine how this subtle problem was dealt with in the testimony and the arguments. In doing so, we find it subject to little doubt that the original or beginning occurrence was a "kick", considered by the witnesses to be simply the loss of normal fluid circulation caused by pressure from below in excess of that exerted by the drilling fluid being pumped into the well. However, it seems equally clear that when immediate efforts to reduce this subsurface pressure failed, a more violent and pronounced expulsion of drilling

fluid occurred and the pressure from below increased. Drastic efforts to overcome this pressure likewise failed, and it was necessary to plug the well. At the time the plug was set, the pressure from below was continuing and increasing. It is rather plain, then, that the ultimate occurrence was almost precisely that which took place in the Means case.

■ As we understand the testimony and the briefs, if a "kick" is not overcome, it can and often does develop into and become a "blowout", and our appreciation is supported by the policy definition in this case. Hence, we are led to the conclusion that if efforts to control a "kick" are unsuccessful and the subsurface pressure increases to the point where the expulsion of drilling fluid is violent and uncontrolled, a "blowout" in the generally accepted sense has occurred.

We gather that defendant would, in principle, agree with this analysis; but it argues that the hole in the drill stem must have been present before the Halliburton men arrived and that the escape of mud through that hole prevented control of the moderate pressure of the "kick". Further, it contends that this "kick" never became a "blowout" in the general sense because its pressure was neither sudden nor excessive and that what occurred does not come within the policy definition of "blowout" because it did not result in *complete* lack of control of the drilling operation.

The record does not contain any evidence from which we can determine with any degree of certainty when or how the hole in the drill stem appeared or whether the mud which was lost would have controlled or reduced the subsurface pressure. We cannot base the outcome of this appeal upon pure speculation. Therefore, we must hold that the loss of mud underground is of no consequence in this case.

■ Moreover, we think it plain that what occurred meets the requirements of the policy definition even though the

safety devices prevented the well from going wild. Even assuming that defendant is correct in arguing that the phrase "resulting in the complete lack of control of the well or drilling operation" requires more than the policy definition in the Means case, we must interpret such a provision in the practical sense. If defendant's position were accepted this policy would cover losses which resulted only from a "wild" well around which nobody could engage in any of the activities normally connected with drilling operations. If that were the intention of the parties, it could have been accomplished much more articulately by a provision so worded. We think this provision meant simply that the "blowout" itself (as distinguished from other causes) must result in the impossibility, as a practical matter, of controlling the drilling operation. The trial court found the required lack of control, and we are unable to say that his finding is clearly erroneous.

■ Passing to plaintiff's contentions in his cross appeal, we must reach the same conclusion. There is conflicting evidence as to the value of the drill stem lost, and we think the trial court acted within the limits of his discretion in fixing its value at $3.50 per foot.

As to sue and labor expenses, the judge allowed plaintiff's claim in full up to the date of February 13, 1951, but found that the expenditures thereafter related only to "normal clean-up" which would have been required at the end of any drilling operation. This finding is not only supported by the evidence, but is the only reasonable conclusion to be drawn therefrom.

■ In considering plaintiff's claim for statutory penalties and attorney's fees, the judge was apparently of the opinion that in view of the facts and the differences in the policy definition, there was sufficient doubt to prevent defendant's refusal to pay from being arbitrary, capricious or without probable cause. We see no reason to disturb this finding.

Affirmed.